AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Andrew C. Erskine, (312) 353-1875

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case Nos. 24 M 18, 24 M 19, and 24 M 20

The green Apple iPhone ("Subject Phone 1"), the blue Apple iPhone ("Subject Phone 2"), and the Cricket Wireless SIM card ("Subject Phone 3"), further described in Attachments A-1, A-2, and A-3

Magistrate Judge Gabriel A. Fuentes



**FILED**
1/18/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Thomas J. Robertson, a Special Agent of the Drug Enforcement Administration, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A-1, A-2, and A-3

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956(h) | narcotics and money laundering conspiracy |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

THOMAS J. ROBERTSON, Special Agent
Drug Enforcement Administration
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: January 18, 2024

_____
*Judge's signature*

City and State: Chicago, Illinois

GABRIEL A. FUENTES, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT     )
     )
NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, Thomas J. Robertson, being duly sworn, state as follows:

1.     I am a Special Agent with the Drug Enforcement Administration. I have been so employed since approximately July 2018.

2.     As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives,

"stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.     This affidavit is made in support of an application for a warrant to search three devices recovered from RICARDO TELLO during his arrest: a green Apple iPhone with an unknown serial number, believed to have the assigned phone number 956-279-2161 ("**Subject Phone 1**"), a blue Apple iPhone with an unknown serial number, also believed to have the assigned phone number 956-279-2161 ("**Subject Phone 2**"), and a Cricket Wireless SIM card bearing serial number 89011503277465239975 ("**Subject Phone 3**") (collectively, the "**Subject Phones**"), for evidence and instrumentalities described further in Attachment B, concerning narcotics and money laundering conspiracy offenses, in violation of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956(h) ("the **Subject Offenses**").

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included

each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of the **Subject Offenses** are located within the **Subject Phones**.

## I.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONES

7.    On September 8, 2023, during the arrest of RICARDO TELLO pursuant to an arrest warrant, law enforcement recovered the **Subject Phones**, and the **Subject Phones** have remained in law enforcement custody, as neither TELLO nor counsel has requested them back. During the booking process for his arrest, TELLO stated telephone number 956-279-2161 was associated with both **Subject Phone 1** and **Subject Phone 2**.[1]

8.    As detailed below, the investigation has shown that from no later than 2019 and until no sooner than 2023, TELLO regularly used cell phones—including with the phone number 956-279-2161—to participate in and, communicate in furtherance of, the charged drug and money-laundering conspiracies, including by WhatsApp and the use of media.

---

[1] According to TELLO, both phones have the same telephone number because it afforded him the ability to respond to text messages on one phone while simultaneously talking on the other. This telephone number was also in contact with ESPINOSA, a coconspirator of defendant (as detailed below).

A.    **Background on Investigation and Charges against TELLO and Coconspirators**

9.    The United States, including DEA, HSI, IRS, and United States Customs and Border Protection, have been investigating OSWALDO ESPINOSA—the Mexico-based leader of a drug trafficking organization that between at least 2018 and October 2023, smuggled thousands of kilograms of cocaine into the United States, transported the drugs to hub cities such as Chicago, distributed the cocaine further from there, and then collected and laundered the resulting cash drug proceeds. The investigations into ESPINOSA and his drug-trafficking organization's activities have resulted in the seizure of at least approximately 807 kilograms of cocaine and at least approximately $8,172,074 in cash drug proceeds.

10.    On or about July 27, 2023, ESPINOSA and 14 others, including RICARDO TELLO, were indicted in the Northern District of Illinois for drug-trafficking, money-laundering, and other offenses (23 CR 426, Judge Alonso presiding). As set forth in the indictment, TELLO is alleged to have been part of the ESPINOSA DTO, including by serving as head of a Chicago-based cell for the conspiracy. Among other things, TELLO is alleged to have served as a logistics coordinator for the conspiracy, coordinating some of the transportation within the United States of concealed loads of cocaine via semi-trailer truck. TELLO also received and distributed bulk cash drug proceeds.

4

**B.      Criminal History of Ricardo Tello**

11.      A review of TELLO's criminal history revealed three separate arrests which resulted in the discovery of bulk amounts of U.S. Currency between October 2019 and March 2020.

12.      According to the arrest report, on or about October 12, 2019, TELLO was arrested on suspicion of violating 18 U.S.C. § 382 (Entering Military, Naval or Coast Guard Property), after TELLO landed an airplane at Wright Patterson Air Force Base near Dayton, Ohio.  A subsequent search conducted of the aircraft resulted in the discovery of a backpack which contained a bulk amount of U.S. Currency.[2] In a post-arrest statement given by TELLO, TELLO stated that he was flying with his family from KGYY [Gary/Chicago International Airport in Gary, Indiana] to Dayton, Ohio, where he had reservations at a Crowne Point Hotel in Dayton, Ohio.

13.      According to the reports, on or about November 26, 2019, members of DEA's Chicago Field Division arrested TELLO in Hillside, Illinois, for money laundering, following a consensual search of a bag that had been in TELLO's possession but that he gave to an undercover agent as part of an undercover money pickup operation. The bag was found to contain approximately $299,530 in cash. A subsequent probable cause search of TELLO's vehicle resulted in the seizure of, among other things, an additional total of $5,700, eight cell phones, and a notebook which appeared to be a ledger listing dates, locations and/nicknames, along with

---

[2] The report denotes different amounts being observed, ranging from $10,000 to $60,000.

dollar amounts, discussed further below.[3] Through my training and experience, along with conversations with other law enforcement officers, I am aware that it is common among drug trafficking organizations to maintain ledgers in order to account for drugs and/or drug proceeds. Similarly, it is common for individuals involved in illicit activities to utilize several cell phones, in an attempt to avoid detection from law enforcement.

14. According to the report, on March 11, 2020, TELLO was arrested for money laundering in Jackson County Texas, following a probable cause search of a vehicle in which TELLO was traveling. The search resulted in the discovery of a black backpack containing several vacuumed sealed bags of cash, along with additional loose cash inside the trunk of the vehicle which had a cumulative total of approximately $213,695. In addition to the cash, law enforcement seized five cellular telephones from TELLO. On or about December 1, 2023, agents in this investigation obtained a warrant to search these phones, which had remained in the custody of Texas authorities. The search began on or about December 5, 2023, and agents continue to conduct the search given the voluminous data involved.

**C.    TELLO's Use of Cell Phones in Connection with Facilitating the Movement of Narcotics**

---

[3] On or about May 11, 2020, investigating members assigned to DEA-Dayton obtained a Federal search warrant for the telephones obtained from TELLO's arrest in Hillside, Illinois. A cursory review of the content of TELLO's phones revealed communication consistent with his money laundering activities for the ESPINOSA DTO, including communication with the Chicago Field Division UC prior to his arrest.

15.     As detailed below, investigators determined that the ESPINOSA DTO smuggled cocaine into the United States, and transported it within the United States, hidden in plastic rolls (among other ways). Further, the investigation revealed evidence of TELLO using cell phones to further this operation. In particular, TELLO appeared to be responsible for getting the emptied plastic rolls back to Mexico.

### 1.     Information from Cooperating Source 1

16.     On multiple occasions, investigators have spoken with CS-1 about CS-1's involvement with the ESPINOSA DTO, including about CS-1's specific knowledge of TELLO.[4] Among other things, CS-1 stated that TELLO also worked for ESPINOSA, and was tasked with facilitating the receiving and distribution of drugs and/or drug proceeds in and around the Chicagoland area.

17.     In addition, CS-1 told investigators about a particular meeting in which CS-1, TELLO, and others participated. Specifically, on or about September 2, 2021, CS-1 was located at a warehouse in Mexico along with ESPINOSA, JOSE ISAIAS MARTINEZ, RODOLFO RIZZO-RAMON, "RICKY" [TELLO], and two other unknown males.[5] At the time of the meeting, 100 kilograms of cocaine was stored

---

[4] CS-1, who has multiple arrests, but no felony convictions, has been charged with drug and money-laundering offenses and has admitted to his/her participation in same. CS-1 is cooperating in the hopes of receiving a sentencing benefit from the government. No promises have been made to CS-1. Information provided by CS-1 in the past has been reliable, as corroborated by seized evidence, agents review of preserved communications, and information provided by other cooperating sources and witnesses.

[5] ISAIAS MARTINEZ and RIZZO-RAMON are charged as co-defendant with ESPINOSA and TELLO.

inside of the warehouse. The meeting served two purposes. The first was that it gave ESPINOSA an opportunity to notify the aforementioned individuals that "material," meaning the cocaine, had arrived. CS-1 said ESPINOSA mentioned that he had "bills to pay." The second reason was so that TELLO could show the aforementioned individuals a "new" method in which they were going to start smuggling cocaine. CS-1 said TELLO learned of the new concealment method from unknown individuals, who were possibly based in Monterrey, Nuevo León, Mexico. CS-1 said that during the meeting, TELLO gave them instructions as to how he wanted the cocaine concealed within rolls of plastic. CS-1 described the plastic as similar to the type used as a moisture barrier on a foundation at a construction site. CS-1 said each plastic roll weighed approximately 56 pounds and was capable of concealing four kilograms of cocaine. CS-1 said TELLO told them to hide the kilograms closer to the outside of the plastic roll so that they would be easier to remove. CS-1 said the drug laden plastic rolls were ultimately placed inside of a cardboard box, which was then placed on a pallet. CS-1 said approximately thirty cardboard boxes fit on one pallet.

18.    According to CS-1, the 100 kilograms of cocaine were later concealed within plastic rolls by MARTINEZ and RIZZO-RAMON and were later shipped from the warehouse to the United States via semi-truck. CS-1 said the cardboard boxes in which the plastic rolls were contained had something to do with Tennessee but CS-1 was unable to recall additional details.

19.    CS-1 said MARTINEZ told him/her on September 13, 2021, that the

8

shipment had successfully crossed the border. CS-1 told investigating agents he/she did not know if that meant the shipment actually crossed into the United States on September 13 or if that was just when MARTINEZ notified him/her.

### 2. Identification of Plastic Roll Operation and Seizure of Narcotics

20. After receiving this information from CS-1, law enforcement conducted a review of U.S. Customs and Border Protection (CBP) databases in an attempt to find the alleged cocaine shipment. Law enforcement found a record of a shipment consistent with many of the details provided by CS-1. According to CBP records, a shipment of 600 packages of polyethylene rolls (a/k/a plastic rolls) weighing 12,000 kilograms was imported into the United States from Mexico on September 11, 2021, at the Hidalgo Port of Entry in Texas via truck. The shipment was held by CBP until it was cleared for entry into the United States on September 12, 2021. The shipper was listed as GOLFIELD GROUP at Paseo de la Alborada in Irapuato, Guanajuato, Mexico, and the listed consignee was VILLAS CLEANING SERVICE at 104 Cadet Lane in Franklin, Tennessee. A search of Google maps showed that 104 Cadet Lane in Franklin, Tennessee, was/is associated with a small residence. This address was listed as the consignee address on at least nine commercial-size shipments between July 2020 and September 2021.

21. According to reports and communications with the agents involved, on March 2, 2022, DEA-Galveston, Texas conducted an operation in which approximately 308 kilograms of cocaine were seized. Much of the cocaine was

9

concealed within black plastic rolls, which were packaged in boxes with labels reading, in part: "VILLA's CLEANING SERVICE" and "104 Cadet Ln Franklin, TN 37064". (This business name and address matches the shipping information on the suspected importation of cocaine in September 2021 described by CS-1.) Due to the packaging of the cocaine, it is believed that the cocaine was being distributed by the ESPINOSA DTO. Displayed below is a photograph from the operation, showing the area where the kilograms had been hidden inside the rolls:



22.     According to reports and communications with the agents involved, between approximately March 23, 2022 and March 24, 2022, United States Customs and Border Protection Officers (CBPO) seized 103 kilograms of cocaine which were secreted inside cutouts within black plastic rolls, similar to those pictured above.  On March 23, 2022, CBPO assigned to the Pharr, Texas Port of Entry conducted a search of a shipment of plastic rolls, as it was entering the United States.   During a

subsequent open-air sniff of the aforementioned plastic rolls, a narcotics detection canine alerted to the odor of the presence of narcotics.  CBPO then conducted further inspection of the plastic rolls which revealed them to contain brick-shaped objects, wrapped in duct tape which provided a presumptive positive for cocaine.  Due to the packaging of the cocaine, it is believed that the cocaine was being distributed by the ESPINOSA DTO.

### 3. Tello's Participation in Plastic Roll Operation, Including through the Use of WhatsApp and Cell-Phone Based Files

23.    On October 13, 2023, law enforcement participated in a telephonic proffer interview with Individual A who has known TELLO for many years. During the interview, law enforcement asked Individual A if he/she had ever heard of TELLO being involved with shipments of plastic rolls. Individual A said he/she learned about this after TELLO was arrested and explained that he/she'd heard from Individual B (who worked as TELLO'S customs broker) about a pending shipment of plastic that was at Individual B's warehouse. Individual A said he/she heard the shipment belonged to either "TIOS", "PRIMOS" or "Abraham," but that it was also connected to TELLO.[6]

24.    On the evening of October 13, 2023, law enforcement spoke to Individual B and received screenshots of pictures of the shipment of plastic from Individual B's attorney. On October 14, 2023, law enforcement participated in a telephonic proffer

---

[6]  ABRAHAM ARECHIGA-SANTILLAN is a co-defendant of ESPINOSA and TELLO. ARECHIGA owns/used to own produce companies named similar to "Tio's" and "Primo's."

interview with Individual B. Individual B, who is a customs broker, confirmed there was a shipment of freight consisting of plastic rolls stored at his/her warehouse and that he/she has been storing the shipment for TELLO since approximately January 2023. Individual B, in summary, explained that in January 2023, TELLO asked him/her if he/she could store the shipment. Individual B said he/she agreed and that the shipment was dropped off at his/her warehouse by a semi-trailer.

25. Individual B, among other things, reported that TELLO had coordinated with Individual B to export approximately 40 to 50 loads of plastic rolls from the United States to Mexico between approximately March 2021 and January 2023. Individual B indicated that he/she still had WhatsApp communications with TELLO stored on his/her phone regarding the plastic. On or about October 17, 2023, United States Magistrate Judge Juan F. Alanis for the Southern District of Texas authorized a search of the shipment of freight consisting of multiple pallets of cardboard boxes containing plastic rolls located within Individual B's warehouse in Hidalgo, Texas.

26. On the same date, law enforcement initiated a physical search of the shipment. Law enforcement focused their search on the pallets wrapped in green stretch wrap, which consisted of approximately 24 cardboard boxes per pallet. The majority of the boxes contained unaltered plastic rolls.

27. As the search continued, law enforcement noticed that some of the cardboard boxes near the middle and bottom of the pallets had two distinguishing features: (1) they had a clear piece of plastic tape on one end; (2) one of the numbers

printed at the bottom of the barcode sticker was filled in. For example, the bottom half of the number "8" was filled in. Law enforcement discovered the plastic rolls within these boxes had been altered/hollowed-out in four spots. The hollowed-out spots were consistent with the size and shape of a brick shaped package of drugs. In total, investigators located 45 altered plastic rolls, but no drugs. Based on the four cutouts in each roll, it's estimated the rolls were previously used to smuggle 180 kilograms of drugs.[7] A photograph of the altered roles is depicted below:

---

[7] Based on this quantity and the low-end estimate of 40 shipments, TELLO appears to have participated in the trafficking of at least approximately 7,200 kilograms of cocaine.



28.     On or about November 28, 2023, United States Magistrate Judge Nadia S. Medrano for the Southern District of Texas authorized a search warrant for Individual B's cell phone.  On December 4, 2023, law enforcement members executed the search warrant on Individual B's cell phone in order to obtain, among other things, the WhatsApp communications between TELLO and Individual B concerning TELLO'S shipment of the plastic rolls.

29.     A review of the phone revealed numerous WhatsApp communication

14

between Individual B and TELLO (using telephone number 956-279-2161—the same number as **Subject Phone 1** and **Subject Phone 2**) between the approximate dates of February 10, 2021, and September 8, 2023, a number of which pertained to TELLO'S shipping of the plastic rolls and/or the above-described "Villa's Cleaning." The latest dating messages relating to the plastic rolls was on or about January 16, 2023. In addition, in these conversations, TELLO used WhatsApp to send pertinent pictures and invoices to Individual B, including invoices for "Villa Cleaning."

30. For example, on February 25, 2021, at 3:36 p.m., TELLO sent a WhatsApp message to Individual B stating, "can you find the last plastic invoice I sent you from Villa Cleaning."[8] At 3:37 p.m., TELLO sent a WhatsApp message to Individual B stating, "to redo new one." At 3:50 p.m., Individual B sent a WhatsApp message to TELLO stating, "hold on." At 5:33 p.m., TELLO sent a WhatsApp message to Individual B stating, "can I send the truck to get loaded with the plastic at your warehouse."

31. As another example, on April 4, 2022, at 4:38 p.m., Individual B sent a

---

[8] Some of the communications obtained during the investigation have been summarized in this Affidavit. The language that is quoted from these conversations throughout this Affidavit is based upon a preliminary review of the conversations, and not on final transcripts of the conversations. The times listed for the conversations are approximate. The summaries do not include all statements or topics covered during the course of the conversations. At various points in the Affidavit I have included in brackets and italics my interpretation of words and phrases used in the conversations. My interpretations are based on the context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation. Some of the conversations occurred in Spanish and were translated to English by Spanish-speaking law enforcement officers. Translations are approximate and are only drafts.

15

WhatsApp message to TELLO stating, "manana cruza los rollos de plastic" [Tomorrow cross the plastic rolls]. TELLO responded stating, "Es el mismo" [The same one]. At 4:40 p.m., Individual B sent a WhatsApp message to TELLO stating, "Villas Cleaning."

32.     As another example, on January 16, 2023, at 5:51 p.m., TELLO sent a WhatsApp message to Individual B stating, "Can I send plastic", followed by "Today."

### 3.     Tello's Communication on WhatsApp about the Plastic Rolls with Cooperating Source 2

33.     According to CS-2, who was a member of the Espinosa DTO, ESPINOSA would ship the plastic rolls with the drugs inside from Mexico to a warehouse in Texas.[9] TELLO would then arrange for unknown freight companies to pick up the rolls and transport them to Chicago, Illinois. CS-2 said TELLO was also involved in having the rolls returned/exported to Mexico as recycled plastic.

34.     A review of CS-2's WhatsApp communications with TELLO (saved as the contact "Ricky" at 956-279-2161—the same phone number used to communicate with Individual B, and the same number for **Subject Phone 1** and **Subject Phone 2**) revealed messages consistent with the above information that CS-2 provided. For example, on February 26, 2021, CS-2 and TELLO discussed the plastic rolls as follows:

---

[9] CS-2 has no prior criminal history, but has been charged with drug and money-laundering offenses and has admitted to his participation in same. CS-2 is cooperating in the hopes of receiving a sentencing benefit from the government. No promises have been made to CS-2. Information provided by CS-2 in the past has been reliable, as corroborated by seized evidence, agents review of preserved communications, and information provided by other cooperating sources and witnesses.

| TELLO: | oye [hey] |
| | como andas [how are you] |
| | cargaste los rollitos [you loaded the rolls] |
| | o no [or no] |
| | de sushi [of sushi][10] |
| CS-2: | Yes |
| TELLO: | ok |
| CS-2: | All set @ ready to eat [sic] |

35. According to CS-2, in the above conversation, TELLO was asking CS-2 if CS-2—after having emptied the rolls of drugs—had them loaded back into a shipping container so that TELLO could have them retrieved.

36. Later, on March 1, 2021, TELLO and CS-2 again discussed the plastic rolls (now referred to only as "sushi") by WhatsApp:

| CS-2: | Oye [Hey] |
| | Y los de sushi no se fueron siempre [And did the sushi leave] |
| TELLO: | Siii [Yes] |
| CS-2: | Neta [Really?] |
| | Ah okay |

_____

[10] According to CS-2, "sushi rolls" was a code phrase used to refer to the plastic rolls that were used to transport narcotics.

17

TELLO:     The guys gonna be there right now he just couldn't get it

out because it was too tight

CS-2:     Ahhh okay got It got it

[. . .]

37.     According to CS-2, in this conversation CS-2 was checking whether TELLO had someone come retrieve the trailer of empty plastic rolls yet from CS-2's business.

38.     Later, on March 21, 2021, the two again discussed the plastic rolls:

TELLO:     oye tu camarada no te dijo q viene mas rollos sushi [Hey, your friend [*OSWALDO ESPINOSA*] didn't tell you that more sushi rolls are coming.]

[. . .]

CS-2:     [in reply to the above] Nelson, vienen? [no, are they coming]

[. . .]

TELLO:     [in reply to the above] no

we [dude]

yo decia por la mia q esta ahi [I said for mine that it is there]

[. . .]

TELLO:     pa sacar [to take out]

18

> CS-2:        [in reply to the first message] I think later this week
>
> TELLO:      oho okok
>
>                  bueno [okay]

39.    According to CS-2, in the above conversation TELLO was asking whether ESPINOSA had told CS-2 that more rolls of drugs were being sent to CS-2. CS-2 said TELLO was asking because he wanted to know whether to retrieve an empty trailer that TELLO had at CS-2's business, or to wait.

40.    Later, on March 31, 2021, the two again discussed the rolls:

> TELLO:      marcame [call me]
>
>                  ya van por los sushis [they are already going for the sushi]
>
> CS-2:        Perfecto

41.    According to CS-2, in the above conversation TELLO was telling CS-2 that TELLO was having people come retrieve the empty plastic rolls.

**D.    TELLO'S Use of Cell Phones During a Drug Money Operation in September 2019**

42.    As detailed below, the investigations uncovered WhatsApp messages—seized from a phone used by ESPINOSA—between TELLO and ESPINOSA relating to TELLO traveling to Ohio to pick up approximately $448,000 in suspected cash drug proceeds.

43.    More specifically, on or about June 17, 2022, law enforcement conducted a consensual search of a condominium on the 30 block of West Ontario Street, in Chicago, Illinois, which was previously rented by ESPINOSA and occupied by

19

ESPINOSA's wife. A search of the condo revealed several pieces of abandoned property, including several cell phones. One of the cell phones was a rose gold colored iPhone, which was later searched and discovered to have been used by ESPINOSA. Located within the cell phone, among other things, were WhatsApp communications between ESPINOSA and TELLO (at 956-279-2161—the same number as **Subject Phone 1** and **Subject Phone 2**) that spanned from February 2017 to November 2019. Some of the communications between ESPINOSA and TELLO appeared to pertain to drug and drug money related activities that were documented in the previously-mentioned ledger seized from TELLO's vehicle on November 26, 2019.

44. For example, according to TELLO's flight logbook on or about September 18, 2019, TELLO piloted TELLO's Cessna airplane from Gary-Chicago International Airport (in Gary, Indiana) to Dayton Wright Brother's Airport in Ohio and back. Communications with ESPINOSA make clear that the purpose of the trip was for TELLO to collect $448,000 in suspected drug proceeds from ESPINOSA's drug customer, Individual C.

45. At approximately 6:48 p.m., TELLO sent a WhatsApp message to ESPINOSA which stated, "They already told you how much it is." At approximately 7:17 p.m., ESPINOSA sent a WhatsApp message to TELLO which stated, "Why are they short 60 [*$60,000*]?" Followed by, "Tell him [*Individual C*] to give you that."

20

46.     According to the seized ledger, on September 18, 2019, TELLO received $448,000 from "NOTARIO" who law enforcement believe is Individual C, and gave it to "Charly," for which TELLO ("RT") kept $3,500, as pictured below:



47.     According to his flight logbook, on September 19, 2019, TELLO piloted TELLO's Cessna from Gary-Chicago International Airport to Moraine Airpark located at 3800 Clearview Road, Moraine, Ohio. Communications with ESPINOSA and the ledger show the purpose of the trip was for TELLO to collect additional drug proceeds totaling $56,000 from Individual C, which was missing from the $448,000 collected by TELLO on September 18, 2019.  Again, TELLO was paid $3,500 for his role.

48.     In particular, at approximately 3:20 p.m., TELLO wrote ESPINOSA, "Notario," "En 30," and "Moraine." At approximately 3:35 p.m., TELLO wrote ESPINOSA, "Tell him in 30" and "NOTARIO's office in Moraine." At approximately 3:35 p.m., TELLO Phone: "To pick up the papers." At approximately 3:43 p.m., TELLO sent ESPINOSA, "Link for Foursquare - Moraine Airpark (I73)."

49.     According to the seized ledger, on September 19, 2019, TELLO received $56,000 from "NOTARIO" for which TELLO received $3,500, as pictured below:

21

### E. TELLO's Use of a Cell Phone During a Drug Money Operation in October 2019

50.    As previously noted, investigators are currently searching phones seized from TELLO by Texas authorities in 2020 during a traffic stop and arrest for money laundering. The search revealed a conversation between TELLO and co-defendant, MARTIN HERRERA-FERNANDEZ, in which TELLO appears to direct HERRERA to pick up bulk cash drug proceeds.[11]

51.    More specifically, on or about October 2, 2019, TELLO and HERRERA had the following WhatsApp conversation relating to a money pick up in Ohio:

> TELLO:      Morning.
>
> TELLO:      Como andas? [How are you doing?]
>
> HERRERA:  Todo bien aqui en la casa [Everything good, here at home.]
>
> HERRERA:  Que hay. [What's going on?]
>
> TELLO:      Hoy pa Ohio. [Today to Ohio.] [*TELLO informing/confirming with HERRERA that there's a money pick up in Ohio.*]
>
> HERRERA:  Simon. [Yes]

---

[11] Agents identified HERRERA as the other speaker based on it being listed in the TELLO's WhatsApp communication as "Martin Herrera – Chicago Produce".

TELLO:      ok deja que me confirmen. [Ok, let me get confirmation.]

HERRERA:    Sale me avisan. [Ok, let me know.]

TELLO:      Dayton, oh 5pm.

TELLO:      Osea 4 pm de nosotros. [Or 4pm on our end.]

HERRERA:    Que rollo [What's going on?]

TELLO:      Deja confirmo la horas. [Let me confirm the times.]

HERRERA:    Ok.

TELLO:      Arrancate. [Go ahead.]

HERRERA:    Ok.

TELLO:      A lo mejor te veo por el camino pero arrancate. [Maybe I
            will see you on the road but get going.]

HERRERA:    Ok.

HERRERA:    Listo. [Done.]

TELLO:      The Chip house.  7727 Washington Village Drive, Dayton,
            OH 45459. [The Chop House located at 7727 Washington
            Village Drive, Dayton, Ohio 45459].

HERRERA:    Ok.

52.    On this same day, October 2, 2019, according to WhatsApp chats recovered from the phone of Individual C (after obtaining a search warrant issued on November 7, 2019 through Franklin County Ohio), co-defendant JORGE BORBON-

23

OCHOA[12] coordinated a money-transfer meeting with the Ohio-based Individual C.[13] In particular, BORBON-OCHOA wrote, "Good morning brother at 5:00 o'clock right??" Later BORBON-OCHOA wrote, "How is it going are you ready? For the drop?" and "It will be at the restaurant where you meet the guy." BORBON-OCHOA then continued, "Is going to be a new guy [*HERRERA*]," "I let you know what car is driving," and "He is of the same company of the guy of Cessna [*TELLO*]."[14]

53. Returning to the conversation between TELLO and HERRERA on October 2, 2019, TELLO continued to direct and supervise HERRERA in relation to the money pick up:

| | |
|---|---|
| TELLO: | Como vas. [How you doing?] |
| TELLO: | Eiii.[Hello.] |
| TELLO: | Hablame.[Call me.] |
| TELLO: | Como vas??? [How's it going?] |
| HERRERA: | Que rollo? [What's up?] |

---

[12] According to CS-1 and CS-2, BORBON-OCHOA (who they identified by picture) is ESPINOSA's primary coordinator.

[13] Individual C was identified as the user of his/her respective telephone, due it being recovered from Individual C during a consensual encounter on November 6, 2019, according to the DEA report. Similarly, BORBON-OCHOA was identified due to a review of WhatsApp communication between telephone number ending in 52-XXXXXX0824 and Individual C between approximately May 12, 2019 and August 20, 2019. This telephone number had been previously identified through a DEA investigation where the user of 52-XXXXXX0824 self-identified as BORBON-OCHOA. A further review of WhatsApp communication between Individual C and the BORBON-OCHOA, as referenced above began on August 21, 2019, with telephone number 52-XXXXXXX9923 stating, "New number too", "Call me to this one too".

[14] According to CS-1, HERRERA worked for TELLO, as part of the ESPINOSA DTO, and may have been employed with TELLO's trucking company.

HERRERA:   Olle nada. [Nothing.]

TELLO:   Perame. [Hold on.]

TELLO:   5 min.

TELLO:   No te estreses. [Don't get stress out.]

TELLO:   Va a ser un carro Nissan de color de la tuya. [It's going to be a Nissan sedan the color is like yours.]

HERRERA:   Ok.

TELLO:   t aviso estando afuera. [I will let you know once its outside.]

HERRERA:   Estoy afuera. [I am outside.]

TELLO:   En el carro? [In the car?]

HERRERA:   A un lado de restaurante. [Next to the restaurant.]

TELLO:   Ok.

HERRERA:   Si. [Yes.]

HERRERA:   Hay una Silverado a lado mio. [There's a Silverado next to me.]

TELLO:   Ok.

HERRERA:   Listo. [Done.]

TELLO:   Ya.

TELLO:   [SCREENSHOT OF A PIN DROP]

TELLO:      716 W Eastman St., Chicago, IL.[15]

HERRERA: Ya llego. [He's here.]

TELLO:      Ok.

TELLO:      Cuanto? [How much?]

HERRERA: 2.

TELLO:      Por las cocheras. [By the garage.]

TELLO:      Ok.

HERRERA: Aqui estoy. [I am here.]

TELLO:      Voy. [On my way.]

54. According to the seized ledger, on October 2, 2019, TELLO received $280,000 from "NOTARIO – MICHOACANO."[16] As previously stated, NOTARIO is believed to be Individual C. Similarly, law enforcement believes "MICHOACANO" to be HERRERA-FERNANDEZ. A further review of TELLO's ledger revealed a deduction of $3,500 paid to "MICHOACANO" (HERRERA-FERNANDEZ), which I believe was HERRERA's payment for the money pickup.

---

[15] A review of a public records law enforcement database revealed TELLO to have a listed residential address at 716 W Eastman Street, Chicago, Illinois.

[16] CS-1 had previously provided information that he/she had met with and received kilogram quantities of drugs from HERRERA. This, in combination with the context of the conversation between TELLO and HERRERA, makes investigators believe that HERRERA was delivering 2 kilograms of drugs to TELLO that Individual C was returning to the ESPINOSA DTO. Through my training and experience, along with conversations with other law enforcement officers, I am aware that it is common for drug traffickers to return kilogram quantities of drugs for a combination of reasons which, among others, include poor quality and/or inability to sell.

55.     A review of the same phone (seized from TELLO in Texas) that had the above-described conversation with HERRERA revealed an application called "Photo Vault," which appears to be a password-protected location to store images. Inside the "Photo Vault" application, investigators located the following two photos of bulk cash (dated October 14, 2019):



56.     According to the ledger seized from TELLO, on or about October 14, 2019, there are two entries—one for "-990,000" and one for "+141,835." Based on my training

27

and experience, I believe these photos depict TELLO transferring out the $990,000 in cash drug proceeds.

### F. TELLO's Use of a Cell Phone in Furtherance of a Drug Money Operation in February 2020

57. As noted, investigators are currently searching phones that were seized by Texas authorities from TELLO in 2020. One of these phones (bearing cell number 773-815-3109) had WhatsApp chats between TELLO and an unknown individual with a Mexican phone number ("UI") discussing what appears to be a drug money operation, as set forth below:

TELLO: Viejon buenos dias le hablo de parte deal gordito me pasaron si contacto para atenderlo. [My friend, good morning I am calling on behalf of the chubby guy [*OSWALDO ESPINOSA*]. They sent me the contact to take care of you.]

TELLO: Viejo pregunta a Carolina no tiene forma de ir? [My friend ask Carolina. You have no way of going?]

UI: Dejame preguntar, pero pues el muchacho queria aprovechar la vuelta dijeron que ahi avia forma de que se viniera con algo de alla lo mandaron ahi. Y asi lo traen vuelta y vuelta dejame hablar si puede conseguir ahi el entero mejor para que no se venga vacio. [Let me ask, the guy [*courier*] wanted to take advantage of the trip, they ask if there's a way you can go back with something from there

28

they send it there. They're going in circles let me talk if you can find the whole one instead so you not come back empty handed.]

TELLO:   si, estoy trabajando en eso. [Yes, I am working on that!]

UI:   Me avisa por favor. [Let me know please.]

UI:   Oiga necesito que me diga si se va poder o no la verdad para avisar. [I need to know if you're going to be able to do it or not so I can let these people know.]

TELLO:   patron, si ya me comunique con la gente. Si se va a poder hacer lo que usted me pidio nada mas ando moviendo a los muchachos yo creo que para la noche debo estar ya listo. [Boss, I already spoke with the people. We're going to be able to do what you asked for, I am just moving my guys. It should be ready for tonight.]

TELLO:   Llamando unas personas para un lado y otras para otro. [Calling some people on one end and others from another one.]

UI:   Bueno te voy a mandar el numero del muchacho que esta alla si puede marcale para que se pongan deaucuerdo 001(832) 245-9858 de parte del Chaparro. [Ok, I am going to send you the number to the guy there. If you can call him to

29

arrange things. 011 (832) 245-9858 on behalf of shorty.]

TELLO:    Ya le Marco. [I will call him now.]

UI:    Buenas ya se pusieron de acuerdo con el muchacho?

UI:    [Good morning did you guys arrange things with the guy?]

TELLO:    Patron Buenas tardes ya esta todo arreglado ya van en camino con el. [Boss, good afternoon everything is set they're in the way with it.]

TELLO:    Es que traemos una recolecta era por todos lados. Y venimos bien tarde ahora si que mas que todo por el dia ahi disculpe. [We got collected items it was all over. We were super late, please excuse us for today.]

UI:    Que monto fue lo que alcanzo a recolectar? [What were you able to collect?]

TELLO:    Deben de traer lo que me pidio ahirita le confirmo exacto. [They got what you ordered now, let me confirm exactly.]

UI:    Ok me avisa por favor el total! Gracias! [Ok let me know the total! Thank you!]

TELLO:    Claro que si patron disculpeme de verdad tanta tardanza normalmente yo estoy al tiro. [Of course boss, serious please excuse me for delaying this usually I am on top of it.]

UI:    Si, no se preocupe usted dele! [Yes, no worries just keep

going!]

| | | |
|---|---|---|
| TELLO: | Listo Patron ya entregaron ahi. [Done boss, it has been delivered there.] | |
| TELLO: | Son 78. [It's 78.] | |
| TELLO: | 72 perdon correccion. [72 sorry, correction.] | |
| UI: | Eso junto con lo 60 que me habia dicho de esos 72 fue todo el total? [All together with the 60 you had told me from those 72 that was the total?] | |
| TELLO: | 72 total. | |

58. Based on my training and experience and familiarity with the investigation, I believe that in the conversation above, that TELLO coordinated the pick up of $72,000 in drug proceeds.

## G.    Additional Relevant Information

59. Based on my training and experience, I know that people who use WhatsApp to communicate typically re-download the application when they move from one phone to a new phone. I also know that when WhatsApp is added to a phone, portions of past conversations may be pre-populated in the application. Accordingly, at a minimum, I believe **Subject Phone 1** and **Subject Phone 2** will contain the WhatsApp application and have many or all of the above-described WhatsApp communications in which TELLO participated. And even if prior conversations did not pre-populate on **Subject Phone 1** and **Subject Phone 2**, the devices

31

nevertheless at a minimum contain the more recent WhatsApp communications with Individual B.

60.     Based on my training and experience, conversations with other law enforcement officers, and online research,[17] I am aware that SIM cards can contain data. As an initial matter, SIM cards contain an international mobile subscriber identity (IMSI) number, which can help connect the SIM card to certain phone records that show the IMSI being used to make phone calls and send text messages. In addition, SIM cards can also hold a limited number of saved contacts and text messages.[18] SIM cards can also hold information relating to a phone's user, such as an associated phone number. Given these facts, and the fact that TELLO was storing **Subject Phone 3** (the SIM card) in his wallet at the time of his arrest, I believe that **Subject Phone 3** may contain pertinent contacts and messages, or may at least connect him to prior phones used by TELLO in the course of the investigation.

61.     Based upon my training and experience, I know that cellular phones may contain relevant evidence of the narcotics and money laundering conspiracy offenses, including text messages made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and

---

[17] *See, e.g.*, "What is stored on a SIM card?" ([https://www.mintmobile.com/blog/what-is-stored-on-a-sim-card/](https://www.mintmobile.com/blog/what-is-stored-on-a-sim-card/)) (last accessed January 10, 2024).

[18] Although some contacts and messages can be saved on a SIM card, they are principally saved on devices or in the cloud.

communication used by, the participants in the narcotics and money laundering conspiracy offenses. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the narcotics and money laundering conspiracy offenses. Moreover, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

62.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information

allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

63.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

64.     Based upon my training and experience, I know that information maintained by cellular telephone providers may include records of calls made to and from the telephone number(s) associated with the **Subject Phones**. As such, the cellular phone numbers and identities of the cellular telephone companies obtained from a search of the **Subject Phones** would enable the government to obtain information from the cellular telephone companies revealing calls made to and from

the **Subject Phones** during the course of the commission of the narcotics and money laundering conspiracy offenses.

65.     Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, commonly use cellular telephones as a means to communicate. Individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** are associated with a target in this case, because there was telephonic communication between participants involved in the narcotics and money laundering conspiracy offenses, and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators, there is probable cause to believe the **Subject Phones**, described further in Attachment A-1, A-2, and A-3, contain evidence of violations of narcotics and money laundering conspiracy.

## II.     SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

66.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence

35

from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused

36

by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

67.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

68.    In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

III.    **PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA**

69.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A-1, A-2, and A-3, so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

70.    The review of electronically stored information and electronic storage media removed from the premises described in Attachment A-1, A-2, and A-3 may include the following techniques (the following is a non-exclusive list, and the

government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

     a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

     b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

     c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

     d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

71.    The government will return any electronic storage media removed from the premises described in Attachment A-1, A-2, and A-3, within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal

Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## IV.    CONCLUSION

72.    Based on the above information, I respectfully submit that there is probable cause to believe that narcotics and money laundering conspiracy offenses, in violation of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956(h), have been committed, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phones**, as further described in Attachment A-1, A-2, and A-3. I therefore respectfully request that this Court issue a search warrant for the **Subject Phones** more particularly described in Attachment A-1, A-2, and A-3, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
Thomas J. Robertson
Special Agent
Drug Enforcement Administration

Sworn to and affirmed by telephone 18th day of January, 2024

_____
Honorable GABRIEL A. FUENTES
United States Magistrate Judge

## <u>ATTACHMENT A-1</u>

## DESCRIPTION OF ITEM TO BE SEARCHED

The green Apple iPhone with no visible serial numbers and three camera lenses, seized from RICARDO TELLO on or about September 8, 2023 ("**Subject Phone 1**"), pictured below:



## <u>ATTACHMENT A-2</u>

## DESCRIPTION OF ITEM TO BE SEARCHED

The blue Apple iPhone with no visible serial numbers and three camera lenses, seized from RICARDO TELLO on or about September 8, 2023 ("**Subject Phone 2**"), pictured below:



## <u>ATTACHMENT A-3</u>

## DESCRIPTION OF ITEM TO BE SEARCHED

A Cricket Wireless SIM card, serial number 89011503277465239975, seized from RICARDO TELLO on or about September 8, 2023 ("**Subject SIM Card**"), pictured below.



**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence and instrumentalities concerning violation of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956(h), as follows:

1.　　All names, aliases, and numbers stored in the phones, including the number associated with the **Subject Phones** and any number directory stored in the memory of the phones, relevant to the identities of participants in the **Subject Offenses** or individuals who may be in communication with participants in the **Subject Offenses** who have yet to be identified or located.

2.　　Between September 1, 2019, and September 8, 2023, all messages and communications, and logs of messages and communications, pertaining to the **Subject Offenses**.

3.　　All media, including digital photographs, audio recordings, and videos, pertaining to the **Subject Offenses**.

4.　　All notes and documents, including ledgers, pertaining to the **Subject Offenses**.

5.　　Between September 1, 2019, and September 8, 2023, information pertaining to the phone's locations, including any search information contained within navigational applications on the phone, that constitutes evidence of the **Subject Offense**.

6.    Application data, including log-in and other account information pertaining to the **Subject Offenses**.

7.    Between September 1, 2019, and September 8, 2023, internet searches or history pertaining to the **Subject Offenses**.

8.    Any SIM card located within the **Subject Phones** that helps to identify the associated telephone number(s), user(s), or provider(s) associated with the **Subject Phones**.

9.    Indicia of the user of the **Subject Phones**.

## ADDENDUM TO ATTACHMENT B

The government's review of removed electronic storage media shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may

continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

The government will return any electronic storage media within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

2